880 So.2d 943 (2004)
Rhonda CLAYTON, Plaintiff-Appellee
v.
BEAR'S TOWING AND RECOVERY, Defendant-Appellant.
No. 38,834-CA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 2004.
Harvey R. Lexing, Monroe, for Appellant.
Rhonda Clayton, In Proper Person.
Before BROWN, GASKINS and PEATROSS, JJ.
GASKINS, J.
The plaintiff, Rhonda Clayton, filed suit in Monroe City Court to recover damages allegedly sustained as a result of the failure of the defendant, Bear's Towing and Recovery (Bear's), to repair her automobile. The trial court awarded Clayton $1,328.62, plus legal interest and costs. For the following reasons, we affirm in part and reverse in part the trial court judgment.

*944 FACTS
In February 2003, Clayton's father,[1] Foster Wilhite, Jr., went to Bear's to purchase a used engine for Clayton's 1994 Ford Aspire. After the used engine was purchased, it was installed by Douglas Freeman at Clayton's home. That engine proved to be defective, and Bear's supplied a second engine which it subsequently rebuilt. In October 2003, Clayton filed suit against Bear's in Monroe City Court for failure to repair her car as promised.
In a handwritten answer, Bear's asserted that Clayton sent Wilhite to purchase an engine, that Bear's sold him an engine, and that he made a deal with a mechanic to put the engine in at Clayton's house. The remainder of Bear's answer stated:
We never took the job to install the engine. When we found out the engine was bad the mechanic brought the car here. He took the engine out & we completely rebuilt the engine to satisfy the customer. We never took the job to install the engine. We did install the engine after the mechanic did not complete the job. We tried everything to make her happy, even took a big lose (sic) on the engine & we ended up installing the engine after it was left. All the time the car was here, her stepdad was the only one ever came by about the car. He OK'd the time it took to rebuild it.
The case was tried in January 2004. Clayton testified that her father, Wilhite, went to Bear's and purchased the used engine for her in February 2003. Greg Brown, the manager of Bear's, told Wilhite that it would be ready "in a couple of days." Clayton stated that Brown was supposed to do the job, but "another guy by the name of Doug" actually performed the work. When the first motor was no good, a second one was installed. Clayton did not know what happened to the second engine; she testified that Wilhite was going to Bear's "like every other day," but Bear's "just kept putting the days off, off, off, and off." Clayton stated that she was paying insurance on the car because they told her it would be ready "in a couple of days" and she did not want to be without insurance on the car.
According to Clayton, she did not receive the car until August, and, after driving it home, she returned it right away because "it was still making noise, burning bad, smoking and leaking oil and stuff." She testified that she received the car again in September on a Thursday. She drove it to work on Friday and Saturday, and on Sunday she took her daughter to the fair. On the way back that Sunday night, the car stopped in the middle of the street near her home.
Another mechanic allegedly told her that the engine had "a real bad oil leak" and the transmission cable was not hooked up to the transmission. Clayton also testified that one of the engines installed caused the radiator "to blow out" and that she had to buy a new radiator at a cost of $170. Although the radiator was supposed to be new, a substance called "Stop-Leak" had been put into the radiator to stop a water leak.
Gregory Brown, Bear's general manager, initially testified that Clayton purchased an engine from Bear's in February 2003; he then stated that Clayton's father, Wilhite, purchased the engine and that Brown never saw Clayton until August 2003. According to Brown, Wilhite wanted to know when Bear's would install the *945 engine. Brown indicated that because they were busy, Wilhite might talk to one of the "part-timers" at Bear's to see if someone could do the installation. Wilhite allegedly spoke to Doug Freeman who agreed to do the installation at Clayton's home "on his own time."
Brown said that Freeman indicated the first engine was no good, so he installed the second engine, but failed to note that Clayton's radiator was "busted at the bottom." Thus, when the car was run after the second engine was installed, the engine blew a head gasket. Brown testified that he told Freeman this problem had nothing to do with Brown, and that the problem was between Freeman and Clayton. However, Wilhite drove the car to the shop and talked Brown into having the engine rebuilt there. Later, Clayton returned the vehicle because it had "a little ticking." Clayton returned again, complaining of an oil leak, but according to Brown, too much oil had been put in the engine, causing oil to come out of the seals. According to Brown, the oil had to be drained off. Brown also indicated that Freeman had broken the shift cable when he pulled the engine out and that Bear's had put in a new shift cable, charging for the cable but not for labor to install it.
Wilhite testified that Clayton told him that she wanted an engine for her car and gave him the money to purchase one. He went to Bear's, bought the engine, and Brown told him that he could put it in for him. However, according to Wilhite, Brown turned the job over to Freeman who "kept putting it off and giving us the runaround." When Freeman did come out and replace the engine, the new engine was no good, so they put another one in that they ended up rebuilding.
On cross-examination, Brown asked Wilhite if he remembered Brown telling him that Freeman could install the engine "on the side on his own time." Wilhite responded in the affirmative. He also stated that he remembered Brown telling him when the car was brought in for an oil leak that the engine had four quarts of oil too much. The court then asked Wilhite if there was a specific agreement between Wilhite and Brown in his capacity as an employee of Bear's to fix the engine, or if Brown told him that Bear's could not do the job, but had a guy who could do the job on the side. Wilhite responded, "Like I said, the agreement ... everybody that I deal (sic) with was with [Brown]."
On re-cross-examination, Brown asked Wilhite if he remembered Brown telling him that the job had to be done on the side and that one of the mechanics or Brown himself would do it on the side to save Wilhite some money because Bear's was too busy to do the installation. Wilhite then responded:
Uh ... no, I just, like I said, it's ... like I said when I first bought the engine, I mean, that's uh ... that's what you told me when we bought it. You asked me uh ... you know, you said that you would put it in. So, well, you know, "I'll put it in for you." And you gave me a price and uh ... that was ... that was....
Again Brown asked Wilhite if he did not remember Brown telling him that Bear's couldn't do the job there because they were too busy and that was why the job was done at the house "on the side." Wilhite responded "No, I don't remember."
The court asked Clayton what receipts she had to support her claims for reimbursement for insurance premiums. When it became apparent that she was lacking such supporting evidence, the court stated it always tried to be fair to all parties, and that it would leave the record open for five days during which time either side could submit additional evidence, such *946 as receipts or additional testimony, to support their respective positions. In the event that additional testimony was offered, the court would have a special setting at the end of the month to receive that testimony.
On January 26, 2004, the trial court rendered judgment in favor of Clayton and against Bear's in the sum of $1,328.62, plus legal interest and costs. The trial court did not supply any reasons for judgment.
The defendant appealed, asserting numerous assignments of error. It claims that Clayton's suit should be dismissed for nonjoinder of Wilhite, Brown, and Freeman. Bear's also claims that Clayton's suit should be dismissed for no right of action. It asserts that Clayton failed to show by a preponderance of the evidence that the company was liable to her and that the court erred in leaving the record open for five days to allow the plaintiff to file receipts for insurance payments.

PEREMPTORY EXCEPTIONS
Bear's argues that Clayton's suit should be dismissed for nonjoinder of Wilhite, Brown, and Freeman. Bear's also argues that Clayton's suit should be dismissed for no right of action. These exceptions are based upon the argument that the contract for purchase and installation of the engine was not between Clayton and Bear's, but between Wilhite, Brown, Freeman, and possibly, Bear's.
We note that Bear's did not raise exceptions of nonjoinder or no right of action in the trial court. Both are peremptory exceptions that may be filed for the first time in the appellate court if pleaded prior to the submission of a case for decision. La. C.C.P. art. 2163. Bear's has made no formal filing of any peremptory exception in this court. Instead, these exceptions are urged in argument in brief.
However, nonjoinder of a party and no right of action are among the peremptory exceptions that may be noticed by the trial court or the appellate court on its own motion. La. C.C.P. art. 927. Nevertheless, we observe that Bear's knew that Wilhite was acting on Clayton's behalf. Under La. C.C. art. 3023, when a third person contracts with a mandatary who has not disclosed his status or the identity of his principal, the third person still is bound to the principal unless the obligation is strictly personal or the right non-assignable. Therefore, Bear's exceptions of no right of action by Clayton and nonjoinder of Wilhite are unfounded. For the reasons that follow, we pretermit any discussion regarding the nonjoinder of Brown and Freeman as unnecessary.

SUFFICIENCY OF THE EVIDENCE
Bear's argues that Clayton failed to show by a preponderance of the evidence that the company was liable to her. This argument has merit, in part.
The duty of an appellate court is to review facts to determine whether the trial court's judgment was clearly wrong based on the evidence, or clearly without evidentiary support, and when testimony on an issue conflicts, reasonable evaluations of credibility and inferences of fact should not be disturbed on review. Hope v. City of Shreveport, 37,759 (La.App.2d Cir.12/17/03), 862 So.2d 1139. For the following reasons, we find that the trial court erred in part in the amounts awarded to Clayton.
The record shows that Clayton purchased an engine from Bear's in February 2003 and that engine was found not to be usable. Bear's supplied another engine, at no cost to Clayton. This engine was installed by Freeman, on his own time, independent of his work at Bear's. Freeman did not notice that Clayton's radiator was damaged and the lack of water in the *947 radiator caused a head gasket on the engine to blow out. The trial court erred in finding that Freeman was working for Bear's when he installed the engine, in finding Bear's to be responsible for the damage to the engine, and refunding to the plaintiff $438, the purchase price of the engine. Further, Bear's was not responsible for the damage to the radiator. The trial court erred in awarding Clayton $170.94, the cost of a new radiator. The trial court judgment is reversed to delete those items from the plaintiff's award.
Bear's took the vehicle to rebuild the engine in June 2003 and returned it to Clayton in September 2003, still not in satisfactory working order. Bear's charged Clayton $289.80 for the work, including $89.80 for a new shift cable. The trial court awarded this entire amount to Clayton. However, the record shows that the shift cable was damaged by Freeman and was replaced by Bear's. Because Freeman's damage was not caused while working for Bear's, Clayton is not entitled to recover the cost of the shift cable. The trial court judgment is reversed to delete this item from the plaintiff's award. The trial court was correct in awarding the cost of the labor, $200.00.
Bear's argues that it could not be liable for Clayton's insurance premiums, but that if it were so liable, the time would have started in June 2003 and ended in August 2003. This argument has merit.
The insurance premiums on the inoperable vehicle were a part of Clayton's damages. Bear's argues that there are provisions in the law for cancellation of insurance on vehicles not in use. However, in this case, Clayton testified that she continued to pay insurance on the vehicle because she was repeatedly promised that the vehicle would be ready "in a couple of days." Clayton was not unreasonable in continuing to make insurance premium payments on the vehicle. However, the trial court erred in awarding Clayton the cost of her insurance premiums for the entire time the vehicle was inoperable, including that time attributable to the actions of Freeman.
The record supports a finding that Bear's failed to make repairs on the vehicle in a timely manner. The plaintiff's vehicle was inoperable for one month in February 2003 due to the defective engine sold by Bear's. Then, in June 2003, Bear's took the vehicle to rebuild the engine. A reasonable time to accomplish that task would have been one month. Therefore, we find that Clayton is entitled to recover her insurance premium of $111.00 in February 2003, for $185.14 in August 2003, and for $72.14 in October 2003. The record shows that no insurance payment was made in September. The trial court judgment is reversed insofar as it awards insurance premiums in excess of these amounts.

ADDITIONAL EVIDENCE
Bear's contends that the trial court erred in allowing the record to remain open for five days for the receipt of additional evidence. This argument is without merit.
According to La. C.C.P. art. 1631(A), the trial court has the power to control the proceedings at trial so that justice is done. Under the provisions of La. C.C.P. art. 1632, a trial court may vary the normal order of trial when the circumstances so justify. The decision to hold open or reopen a case for production of additional evidence rests within the discretion of the trial judge, which decision will not be disturbed on appeal unless manifestly erroneous. Harris v. West Carroll Parish School Board, 605 So.2d 610 (La. App. 2d Cir.1992), writ denied, 92-2787 (La.1992), 609 So.2d 255.
According to Bear's, the trial court left the record open for five days after the *948 close of the case for Clayton to file receipts which she did not have at trial, even though it was her obligation to be ready for trial. Bear's asserts that it was prejudicial for the court to leave the record open and then to use the documents to make a ruling.
We observe that the trial court left the record open for both sides to supply additional evidence. We also note that Bear's made no objection or complaint of any kind at the trial about the holding open of the record. We detect no abuse of discretion in this case.

CONCLUSION
For the reasons set forth above, the judgment of the trial court is affirmed in part, reversed in part, and rendered. We award judgment to the plaintiff, Rhonda Clayton in the amount of $568.28.[2] Costs are assessed one-half to the plaintiff and one-half to the defendant.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] Mr. Wilhite is referred to by the plaintiff as her father and by the defendant as her step-father.
[2] This amount represents $368.28 in insurance premiums for the time the car was inoperable due to the actions of Bear's and $200 for repairs charged by Bear's that did not remedy the problem with the car.